# STEAM RAILROAD COMPANIES, In re.

Public Utilities Commission.

No. 27470.   No. I & S 271.   Decided April 26, 1958.

Robert R. Artz, Philadelphia, Pennsylvania, Richard J. Murphy, Chicago, Illinois, Robert L. Barton, Columbus, Benson T. Buck, Richmond, Virginia, Charles J. Henry, Jr., Baltimore, Maryland, Thomas O. Broker, Cleveland, for Applicants.

C. F. Taplin, Jr., Cleveland, for Ohio Coal Association, Intervenor Protestant.

Wilson W. Snyder, Toledo, for The Toledo-Edison Company, Intervenor Protestant.

Bruce W. Eaken, Cleveland, for The North American Coal Corporation, Intervenor Protestant.

**332**

Victor F. Greenslade, Jr., Cleveland, for The Cleveland Electric Illuminating Company, Intervenor Protestant.

J. C. Sloss, New York, N. Y., for Allied Chemical and Dye Corporation, Intervenor Protestant.

John J. Prince, Jr., Cleveland, for The City of Cleveland, Ohio, Intervenor Protestant.

E. F. Malaney, Akron, for Robinson Clay Product Company, Intervenor Protestant.

C. J. Kucera, Toledo, for The Toledo Board of Trade, Intervenor Protestant.

## FINDING AND ORDER

HISTORY OF THESE PROCEEDINGS:

These cases are filed by the Ohio railroads, basically, to conform their rates and charges for intrastate transportation to their interstate charges.

On December 23, 1957, the Eastern railroads filed an Application for increased rates on certain commodities with the Interstate Commerce Commission, to become effective on February 1, 1958.

Under date of February 11, 1958, the Interstate Commerce Commission authorized the Applicant railroads to increase their rates in accordance with the Applications, but that agency ordered the immediate institution of an investigation into the lawfulness of such rates. The railroads are collecting such increased rates subject to refund.

Under date of December 20, 1957, these Applicant railroads filed an Application with this Commission to institute in Ohio, subject to refund, rates identical to those proposed for interstate service.

The Protestants herein, objected to the proposal of the Applicant railroads. They assert that the Public Utilities Commission of Ohio is without authority to approve a proposed rate subject to refund. They further asked that no hearings be had on such Applications until the Interstate Commerce Commission had completed its investigation and taken final action.

Such objections were overruled and public hearings were held on January 21, 1958, February 27, 1958 and February 28, 1958.

The Commission coming now to consider the above-entitled Applications; the testimony adduced at the several public hearings thereon; the Briefs of the Parties; and being otherwise fully advised in the premises and in compliance with §4903.09 R. C., hereby renders the following Opinion:

Summary of Applicant's Testimony

**Eugene S. Root**, Chief of Research, Erie Railroad Company, testified as follows:

As of December 31, 1956, there were 17 Class I railroads in Ohio, which operated 8738 miles of road in Ohio, or 18% of their total mileage.

Seven railroads in Ohio operated less than 20 miles of track, therefore, there are ten pricipal Ohio railroads. These ten railroads operated 8682 miles of railroad in Ohio, or 21% of their total trackage. Four railroads, the Baltimore & Ohio, the New York Central, The Nickel Plate and the Pennsylvania Railroad are the principal roads in Ohio which originate coal. These four railroads operated 6781 miles in Ohio, or 23.6% of their total trackage.

All data which this witness will submit are based upon system-wide costs and revenues. This case represents the third time in thirteen months that these railroads have sought a freight rate increase in Ohio.

As to the Net Railway Operating Income for 1957, the ten railroads had $280,000,000 producing a return of 3.40%, on net investment. Only in the years 1949 and 1954 was the rate of return lower. The four coal railroads had an operating income, for 1957, of $129,000,000, producing a rate of return of 2.19%, on net investment. This corresponds to the rate of return during the recession years of 1949 and 1954.

The 1598 traffic volume will be lower than the volume handled in 1957. A decline in the revenue ton miles of 7.8% for the ten principal railroads and of 6.3% for the four coal railroads is anticipated. Passenger miles are likely to decline 9.3% for the ten principal railroads and 10.1% for the four railroads. The net railway operating income of the ten principal railroads will decline approximately one-third in the next year, and their rate of return will fall to 2.19%. If such decline occurs, it will produce one of the lowest rates of return in modern times. Net Operating Income of the four coal railroads will drop 50%. The rate of return for these railroads will fall to 1.12%, which will represent its lowest rate of return in some seventeen years. Earnings of the four railroads will fail to cover fixed charges by almost $4,000,000.

Working capital of the ten principal railroads declined 70% from December 31, 1945 to December 31, 1947. Working capital for the four railroads declined 75% during the same period. From October 31, 1956 to October 31, 1957, working capital of the ten principal railroads in Ohio declined 29% to $90,636,300. For the four railroads which originate coal, working capital declined one-third to $56,313,432.

The railroads continue to experience a steady increase in their fixed costs.

Material prices have also increased during this same period under observation. This is especially true with reference to material prices other than fuel during the period from April 1, 1957 to October 1, 1957. During this same period, a decrease in fuel prices occurred.

The testimony of this witness also outlined in detail increase in wages and cost of living adjustments and private line car mileage rates. Rate increases previously granted in cases No. 26,663 and 26,627 did not take into consideration additional payroll taxes, which accompanied such increases.

The increases under consideration in this proceeding are not designed to offset all the cost increases. For example, the carriers' proposal here under consideration does not include the November 1, 1958, wage increases, and the aggregate increase in cost which he has listed in his testimony. The rate increase, if it is granted as applied for both

interstate and intrastate, will produce additional annual revenues of $77,346,000 for the ten railroads and $58,499,000 for the four coal railroads. Of these amounts, $62,114,000 and $46,894,000 respectively represent an average increase in freight rates of 2.3% for the ten railroads and 2.5% for the four bituminous railroads. Even if the rates were to be in effect for the full year of 1958, which they will not, Net Railway Operating Income for the ten principal railroads would be $231,560,000, a rate of return of only 2.78% as compared with the 3.40% experienced in 1957, and 4.25% rate of return experienced in 1956.

· It appears that the rate of return for the ten principal railroads in 1958 at their present rates would be only 2.19%. Because the rate increase proposed by the carriers will not be in effect for the entire year of 1958, their rate of return will be something less than 2.78%. As to the four coal railroads, the proposed rate increase for the entire year would result in net operating income of $102,903,000 and a rate of return of 1.74%.

The increases vary between commodities but the average result for the ten principal railroads would be a rate of return of 2.3% and for the four bituminous coal railroads, 2.5%. If the rate increase were to be fully granted, as applied for both inter- and intrastate, it would produce additional annual revenues of $77,346,000, which would represent 2.6% of the total freight revenues of the ten principal railroads. The ten principal Ohio railroads operate at a rate of return of 3.40% and the four coal railroads are operating at 2.19%. The six remaining railroads, after consideration of the four coal originators, would, therefore, operate at a rate of return of 6.4%.

**Stipulation Between Applicants and**
**Toledo Board of Trade**

Counsel for the Applicant railroads read for the record a stipulation entered into by the Applicant railroads and C. J. Kucera, Representative of the Board of Trade, Toledo, Ohio. The stipulation reads as follows:

"It is hereby stipulated that with the approval of this Commission, Tariff X-212, identified as Ohio PUC 2619 now before this Commission under Application No. 27,470, be permitted to become effective on Ohio intrastate traffic effective at the discretion of the Commission, except such items and commodities as are now under suspension by order of the Interstate Commerce Commission and ex parte 212, Increased Freight Rates, 1958, as more fully described in Supplement No. 4 to Tariff X-212 and that the effective date of such suspended matter on Ohio intrastate traffic be voluntarily extended or suspended by Respondents or carriers' party to Tariff X-212 to and including October 31, 1958.

"That all tariffs and supplements containing new rules, rates, charges and regulations covering reconsignment, diversion and the surrender of shippers' order bill of lading, now under suspension in I. & S. Docket 271, be voluntarily suspended by Respondents on Ohio intrastate traffic to and including October 31, 1958.

"That any additional increases in freight rates and charges, rules and regulations which may be authorized by the Interstate Commerce Commission as a result of their investigation of the items, commodities,

etc. now under suspension in Tariff X-212, and the reconsigning and diversion tariffs made effective on Ohio intrastate traffic within forty-five days following the decision of the Interstate Commerce Commission.

"That such Order or Orders of this Commission in Application No. 27,470 and I. & S. No. 271 include the following:

" 'It is further ordered that an investigation be, and it is hereby instituted into and concerning the lawfulness of all the rates, charges and regulations contained in the schedules covered by Application No. 27,470 and I. & S. 271 with a view to making such findings and Orders in the premises as the facts and circumstances shall warrant, all the said schedules to be subject to the refund provision appearing in Rule 13 of Tariff X-212, substituting the Public Utilities Commission of Ohio, where Interstate Commerce Commission now appears in this Rule.' "

This stipulation relates solely to the transportation of grain, grain products, and related articles.

**Roy S. Kern,** Chairman of the Coal, Coke and Iron Ore Committee of the Central Territory Railroad, next testified. This witness has been employed in this or similar capacities since December 1, 1928. The Coal, Coke and Iron Ore Committee is an organization existing under Sections 5-A of the Interstate Commerce Act. It deals with rate and other traffic matters on coal, coke and iron ore within the central territory of which the state of Ohio is a part. The testimony of this witness is offered in behalf of the petitioning railroads and is limited to the proposed increases in rates on coal and coke.

The Interstate Commerce Commission, by a decision dated February 11, 1958 in ex parte 212, increased freight rates and permitted the increases in bituminous coal rates as published in the tariff of increased rates and charges known as X-212. Bituminous coal throughout the east and within Ohio is, by far, the most important commodity which is handled by the railroads. It produces more railroad revenue than any other single commodity. In 1956, bituminous coal accounted for 37.8% of the tons and 25.5% of the revenue derived by railroads in the Eastern district. Coal is produced in large areas of Pennsylvania, Maryland, West Virginia, Virginia, Eastern Kentucky and Ohio. Because of the intense competition between the coals produced throughout this area for the production of heat or energy there have been developed adjustments of rates, both interstate and intrastate, which reflect these competitive relationships. These adjustments are referred to as "Fixed Differentials." Relationships between competing origin districts of coal are especially important throughout this coal-consuming territory in Northern Ohio. On March 5, 1956, the Interstate Commerce Commission in its Case No. 25,566, found that certain rates on bituminous fine coal from Ohio origins to Cleveland, Lorain, Avon Lake and Willoughby and intermediate points were in violation of the provisions of Section 13 of the Interstate Commerce Act and required in its decision that the rates be increased to a level reflecting the established relationships with interstate rates from Pittsburgh, Connellsville, Fairmont and other districts in Pennsylvania and West Virginia. This decision of the Inter-

state Commerce Commission was appealed to the United State District Court at Cleveland by the Cleveland Electric Illuminating Company, the North American Coal Corporation and the Ohio Coal Association. On December 17, 1956, ·the statutory three-judge court upheld the decision and order of the Interstate Commerce Commission. The decision of this lower court was affirmed by the United States Supreme Court in a per curiam decision, dated June 17, 1957.

Only by increasing the Ohio intrastate rates to the same levels as interstate rates can the relationship approved by the Court be maintained.

In 1928 the value of coal was .41c per ton less than the average railroad rates. Although the figures vary considerably from year to year, the value of coal continued to be less than the average rail rates until the year 1941. Beginning with the year 1942, and for each year through 1957, the value of coal exceeded the railroad rates. In 1956, coal was worth $1.37 more than the average rail rate and in 1957, the difference was $1.54. Thus, in 1928, the value of coal represented 45% of the destination value and the rail rates 55%, whereas in 1956, the FOB mine value of coal constituted 58.3% and in 1957, 58.9% of the destination value. The relationships which average rail rates bore to the destination values declined correspondingly and were 41.7% in 1946, and 41.1% in 1957. These figures demonstrate the fact that, in recent years, coal transportation rates have advanced much less than coal prices.

With specific regard to the protest of the Allied Chemical & Dye Corporation, which operates coke ovens at Ironton, Ohio, as to the proposed increase of .15c per net ton in coke rates, the testimony of this witness indicated that the chief objection of that Company to the carriers' proposal is that, in this proceeding, the railroads are proposing an increase on coke, which is .5c per ton higher than that proposed on coal; whereas as in other past rate increases, coal and coke have been treated the same. The witness expressed the opinion that it is proper for there to be a differential or higher increase on the rates for coke than on coal. Because of its higher value, much lighter loading, and smaller volume of movement, as compared with coal, the Interstate Commerce Commission has authorized a higher rate for coke than coal. As to the average value of the two commodities, coke in 1956 was worth $17.58 per ton F. O. B. the oven, and the average loading of it was about 35 tons per car. Bituminous coal had an average value in 1956 of $4.82 per ton, and it loads approximately 60 tons per car. Thus, an increase of .15c on an average car of coke would produce revenue of $5.25 per average car, and a .10c increase on coal would produce $6.00 per car. The witness found the differential in the two rates to be justified in view of the different uses for the two commodities. Except for very minor instances, coke is not used for home heating. Coal constitutes the raw material from which coke is produced.

Summary of Protestant's Testimony:

Donald Gasper, a business analyst for the Pittsburgh Consolidation Coal Company, appearing on behalf of the Transportation Committee of the Ohio Coal Association testified as follows: The Ohio Coal Asso-

ciation is a voluntary association which produces a bituminous coal. Its member mines are located within the state of Ohio, and their annual production of bituminous coal for 1956 was approximately 20,000,000 tons. The witness prepared certain exhibits which he discussed as follows:

**Exhibit A:** Showing the 1956 ratio of tons and revenue of bituminous coal to total carload traffic and total freight revenue from such traffic from the ten principal Ohio railroads.

**Exhibit B:** setting forth the rate of return, with and without passenger deficits, for the ten principal Ohio railroads in the year 1956 and the three principal coal hauling railroads that operate within the state of Ohio, this exhibit reflected an aggregate rate of return of 8.40% upon the total freight service income. Taking net operating income, which includes the deficit from passenger service, the witness's exhibit indicates the rate of return to be 6.21%. This exhibit also reflects an 8.40% rate of return upon freight service for the three principal railroads and compares with six percent for the seven other principal carriers in Ohio and the 6.21% of net railway operating income for these three railroads, which compares with 3.57% for the other seven railroads. This exhibit also illustrates that, where bituminous coal constitutes a major portion of a railroad's revenue, the rate of return for such railroad is well above that of those railroads where bituminous coal is not a significant factor.

The witness took sharp issue with certain statements by railroad witness Kerns when that witness represented that increases in coal rates authorized by the Interstate Commerce Commission and the Public Utilities Commission have been advanced by more modest amounts in rates on commodities, generally.

**Exhibit C:** setting forth both the average revenue per ton authorized with respect to bituminous coal and all other freight commodities, as well as the average revenue per ton realized with respect to coal and all other commodities during the post-war period, commencing with the year 1956. This exhibit showed a very different picture from that painted by witnesses for the Applicant. This witness took issue with the testimony of witness Root to the effect that the proposed increases for the ten principal Ohio railroads would constitute but a 2.3% increase. By applying the .10c increase proposed on intrastate rates for coal to the freight rate of 3.37% from the Ohio No. 8 field to Cleveland, the witness finds that the proposed increase will be at least 3% on coal. The witness stated that, in the past, the railroads had proposed smaller increases generally for bituminous coal and other commodities. In this proceeding, the usual practice is reversed. Under the present proposal, coal is to bear a heavier proportion of increase than it ever has formerly

**Exhibit D:** showing competitive fuel sales in Ohio. This exhibit compares the year 1956 with the year 1946. In regard to the competitive fuel sales in Ohio, the witness stated that this exhibit clearly showed that coal has relatively lost its former dominant position in the fuel market in Ohio.

While the total size of the fuel market has increased materially,

coal's share of the increased market·has decreased from approximately 75% to a present 55%.

**Exhibit E:** indicating that the railroad industry in Ohio had lost even more than the coal industry as a result of the railroad pricing policies. This exhibit is designed to demonstrate that coal transported by rail has dropped substantially, whereas, in the same period, rail participated in transportation of coal to the extent of 71% while truck and water transportation participated to the extent of 29%. During 1956, rail participation had dropped to 57% and truck and water transportation had increased to 43%. Except for approximately half a million tons, the entire increase in the·total Ohio revenue freight shipments between 1946 and 1956 has been diverted from rail to water or truck.

**Exhibit F:** relative to the instance when non-revenue railroad fuel was included in the total shipments. Such shipments of Ohio coal for the same base period were about 5% below that for the last full year 1956, but in the meantime, rail participation in total shipments had declined from 76% to 59%. The witness stated that, if the trend which he had found to exist under the data set forth in his Exhibits E and F were to continue, in a very short period of time the railroads will enjoy less than a half of coal traffic originating in Ohio mines. The witness feels that the exhibits which he had presented clearly indicate that both the coal industry and the railroads are suffering from the policy of railroad management which imposes burdensome freight increases on the transportation of bituminous coal.

**Exhibit F:** showing that the situation he described does not arise through the fault of the coal industry. This exhibit indicates that the F. O. B. mine price for Ohio coal has increased only 5%. In the meantime, major elements of cost in the production of coal, such as wage rates, supplies and capital items have increased from 65% to 90%. During the same period, the freight rates on coal transported from the Ohio No. 8 District to Cleveland have increased 39%. By virtue of greater productivity and expenditure of large sums of capital to increase the mechanization of the mines, as well as to increase the quality of the product, through its proper preparation, the coal industry has absorbed substantially all increased costs imposed upon it by its suppliers, while at the same time, the rail carriers were passing on their increased costs to the shipping public by means of continual freight rate increases. The witness feels that the efforts of the coal industry to retain its markets by capital expenditures and by absorbing its own costs, has in effect been defeated by the imposition of freight rates by the rail carriers.

The witness was critical of Applicant's Exhibit No. 4 designed to show that coal freight rates over the years have been advanced less than coal prices.

**Roger D. Kurfman,** fuel agent for the Cleveland Electric Illuminating Company, next testified as follows:

This witness had previously testified before the Commission in connection with the Application of the Arrow Trucking Company for a contract motor carrier permit to transport coal for his company. His com-

pany serves over 530,000 customers and 1,700,000 sq. miles of territory in Northeastern Ohio. The company also operates a steam heating business, serving most of downtown Cleveland. Coal is the most important element used in producing the products of this company. The annual tonnage of coal consumed by the Illuminating Company has increased from 1,412,998 net tons in 1940 to 3,024,916 net tons in 1957. In 1956 and 1957, approximately 18% of the revenue of this company was expended for the delivered cost of coal. The cost of coal, therefore, vitally effects the price of the electricity which this company produces. The approximate delivered cost of coal to the Electric Illuminating Company in 1957 was $21,077,000. The Illuminating Company received 2,264,082 tons of coal by rail in 1957. The rail freight charges involved in the rail transport of this coal from the mines to the plant of the company amount to approximately 45% of the delivered cost of rail delivered coal, or approximately $3.20 per ton during the year 1957. During 1957, the Illuminating Company paid $7,244,620 to the four railroads: the B & O, the New York Central, the Nickel Plate and the Pennsylvania. During 1957, approximately 76% of the coal or 3,008,943 tons received by the Illuminating Company was received from mines located in Ohio. Of this coal, which originates in Ohio, approximately 1,803,402 tons were transported by rail. Of this figure of 1,803,402 tons, only 900,000 tons will be required in the year 1958. The witness objected to the railroads' "piecemeal" approach to rate making, stating that they had sought a considerable number of rate increases in the last few years The Cleveland Electric Illuminating Company is determined to utilize its Engineering and Managerial skills in order to develop means to counteract the effects of the ever-increasing delivered coal costs. By means of this improved technology and of investments of capital, the Illuminating Company has reduced the number of pounds of coal required to generate each kilowatt hour of electricity from 1.24 in 1948 to .90 in 1957. This constitutes approximately a 27.4% increase in efficiency during this same period. Likewise, the Illuminating Company is implementing a program of diversion of its coal transportation from the railroads to other media such as pipelines and motor vehicles. It has also increased the delivery of electric energy by wire from plants located in the coal fields on the Ohio River. The coal pipeline which the Illuminating Company has begun to use is presently in its "shakedown" phase. It is approaching its capacity of 1,250,000 tons per year.

Any additional increase in freight rates will only have the ultimate effect of motivating the Illuminating Company and other such consumers of coal to divert additional tonnage from the railroads to other forms of transportation.

In order to meet its needs, for increased generating capacity, the company has annuonced its construction plans for major electric power plants to be located at Rayland on the Ohio River adjacent to large coal deposits. Such transportation of coal as is required at these new locations will be made by barge and truck to the new plant. The Illuminating Company began receiving a portion of its coal by motor truck in 1950. This trucking of coal was eliminated in 1954 when a "truck competitive rate" was instituted by the railroads. This com-

petitive rate was later withdrawn.  An exhibit indicating the amount and percentage of tons of coal received by motor truck from the years 1954 through December of 1957 showed that in the year 1954, 5.7% of the total amount of coal received was transported by truck; whereas, in the year 1957, 23.9% was thus transported.  Despite the substantial diversion of its coal to other means of transportation, the present proposal of the railroads would have a very serious and substantial effect upon the direct operating costs of the Cleveland Electric Illuminating Company.  Even if the Commission were to deny the increase in rates here being considered, the Cleveland Electric Illuminating Company would not abandon its program of diversion of freight to other means of transportation.

**J. C. Sloss,** an employee of the Allied Chemical & Dye Corporation, next testified as follows:

His company has a plant located in Ironton, Ohio, engaged in the production of coke.  Fifty to fifty-five per cent of its total production is delivered to points within Ohio.     This represents a volume of approximately 200,000 tons per year.  The protest of his company goes basically to the greater increases on coke than on coal.  This Application represents the first time in recent years that the railroads have sought a higher rate on coke than on coal.  There has been no change in the transportation characteristics of either commodity.  Long established practice dictates that the rate should be the same on both commodities.  Since it takes one and one-half tons of coal to produce one ton of coke, the witness feels that increases in transportation costs of coal must of necessity be reflected in the price of coke.  The Applicant railroads have indicated that the rate increase which they are requesting amounts to 3%, overall.  As to 46 points in Ohio, to which this company ships 5 cars or more of coke out of its Ironton plant, the rate averages $3.95 per ton.  The 15% net ton increase proposed, therefore, represents an approximate 4% increase on coke.  This company is presently studying the use of motor trucks for its transportation, although as of the present date, no coke is actually moving by motor vehicle.

**E. F. Malaney** of the Robinson Clay Products Company of Akron, Ohio, next testified as follows:

Crude clay moves in open-top cars and is unprotected from the elements.  It is subject to a mine weight of 90% of the marked capacity of the rail car, and has a value of approximately $2.00 per ton at its point of origin.  Crude clay in open-top cars moves for relatively short distances, because of its low value.  The witness identified his Exhibit H, showing the increases proposed in this proceeding.  Group 323 of the exhibit covered various types of clay which could be moved in closed cars.  Group 641 includes fire clay, and this group indicates that the proposed increase of .01c per hundred pounds or .20c per ton would apply to fire clay as processed clay which has a value of approximately $10.00 per ton at the point of origin.  Exhibit I, showing certain articles that are included in Group 339 as "products of mines," which articles have characteristics as regards to shipping similar to those of crude clay and bulk, was next identified.  Upon this latter group of articles,

the rail carriers propose an increase of .10c per ton. Group 641 includes fire clay, and this group indicates that the proposed increase of .01c per hundred pounds or .20c per ton would apply to fire clay as processed clay, which has a value of approximately $10.00 per ton at the point of origin.

Exhibit I showed certain articles that are included in Group 339 as "products of mines," which articles have shipping characteristics similar to those of crude clay. Upon this latter group of articles, the carriers propose an increase of .10c per ton.

The witness appeared specifically to urge the Commission to consider crude clay, either fire or common clay, as a "product of mines" and to disallow any increase greater than that proposed for Group 399, which is .10c per ton. Upon cross examination, the witness admitted that there is no actual change in the grouping of raw clay. What he is proposing is that clay now be treated as a "product of a mine" and thus receive a more beneficial rate.

Witness Gasper, who was recalled, stated that the pricing policy of the railroads, under present rates, results in a higher rate of return on the movement of coal than on the two other large groups of service; namely, transportation of other freight and passengers. Further, he stated that his Exhibits A and B indicate that where there is a larger percentage of movement of coal by railroads, the rate of return on investment is higher than where the movement of coal is lower. Thus, there is a correlation between the return and the proportion of freight business to other types of freight. Also, the exhibits that were designed to show that where consideration is taken of the movement of equal amounts, the situation is that the larger the percent of the passenger business, the lower the return on the particular railroad.

**Eugene S. Root,** who had testified previously, was then called in rebuttal. The witness criticized the testimony and exhibits offered by witness Gaspar.

**Roy S. Kern,** having testified previously, was re-called in rebuttal. The witness criticized the Protestant's testimony and exhibits insofar as they related to the transportation rates on coal.

**Commission Discussion**

The primary issues submitted for the consideration of this Commission in this proceeding would appear to be resolved into two basic categories, to wit:

I. The question pertaining to the validity of the Applicant railroads' proposed incorporation in their proffered tariffs a provision for refunds on the new intrastate rates for which they have applied herein in the event like interstate rates should be determined by the ICC to be unreasonable and thus, subject to refund under Federal law; and,

II. The efficacy and sufficiency of the increased intrastate rates and resultant return sought by the Railroads' application as to be determined by the Commission upon the merits from the record of this proceeding.

I. **Questions of Law**—With regard to the legal issues, it should be stated, at the outset, that the Commission has been immeasurably assisted by the excellent briefs submitted by all counsel in this case. It

would appear that the ultimate legal question posed herein for the Commission's determination is as follows: "Do the provisions of existing Ohio statutes permit Ohio railroads to file tariffs for intrastate rates providing for refunds of said proposed intrastate rates to the extent that the Interstate Commerce Commission may determine subsequently by appropriate order that like interstate rates are unreasonable, said refunds being based upon any subsequent rate reductions which may be ordered by the Interstate Commerce Commission on interstate rates?"

In this proceeding, as in other railroad rate cases in recent years, the Applicant railroads seek basically to conform Ohio intrastate rates to the increased interstate rates authorized previously by the Interstate Commerce Commission. The requirements of pertinent provisions of federal statutes purportedly precluding discrimination between rates for interstate and intrastate rail freight traffic has been well established by case law and judicial interpretation and further discussion thereof would not appear to be necessary herein.

The instant Application differs from those filed in past cases, however, in that the Applicant rail carriers have, with the approval of the Interstate Commerce Commission, made their newly increased interstate rates immediately effective, subject to being refunded in part or in whole by order of the ICC at the conclusion of that Federal Commission's investigation of the reasonableness and propriety of such new rates, which investigation is now under way. The Applicant rail carriers have incorporated within their interstate tariffs filed with the ICC a provision calling for refunds of rates upon any commodities as to which the Interstate Commerce Commission may later order reduction of such rates after full investigation. The Applicants have proffered for filing with this Commission tariffs incorporating a similar provision for refunds. Under this proposed arrangement, any refunds of rates applicable to Ohio intrastate traffic would, of course, depend entirely upon subsequent ICC determination of the propriety of the presently effective interstate rates and would be effected to conform Ohio intrastate rates to the interstate rates so finally determined by the ICC.

The Protestants allege that such voluntarily proposed refund tariff provision is not acceptable or valid under existing Ohio statutory law, their position appearing to be substantially as follows:

(1) The Public Utilities Commission of Ohio has only that jurisdiction expressly granted to it by statute;

(2) There are no provisions of extant Ohio statutes which expressly provide for a refund of the nature herein proposed by the railroads;

(3) This Commission, therefore, must find and establish the just and reasonable intrastate rates for Ohio traffic without reference to past or prospective rates; and,

(4) Accordingly, the refund provision proposed by the railroads for incorporation in their proffered tariffs is invalid under Ohio law as to intrastate freight traffic within this State.

There is indeed a degree of efficacy to the legal tenets urged by these Protestants. The powers of the Public Utilities Commission are circumscribed by and limited to those powers which are expressly granted

by statute. As a statutorily created legislative body, this Commission enjoys no implied powers.

In this connection, it is to be noted that the Ohio statutes which outline the procedures for railroad rate making are similar, and in many instances identical, to the provisions for rate fixing contained in the Interstate Commerce Act. Some signification may well be accorded to the fact that §4909.27 R. C., which is substantially an exact replica of Section 15 (7) of Title 49 U. S. C. A. of the Interstate Commerce Act, makes no reference whatsoever to refund of rates; whereas, this analogous Section of the Federal Act provides an extensive mechanism for the finding and awarding of refunds by the Interstate Commerce Commission. The conclusion may be drawn, perforce, that the Ohio Public Utilities Commission has not been granted by the State Legislature, the scope and character of statutory jurisdiction in regard to refunds of rates which is delegated by Congress to the Interstate Commerce Commission.

On the basis of this statutory construction, the Protestants allege that Ohio shippers may suffer serious and even irreparable damage in the event the instant Application should be approved by the Commission: This allegation is predicated upon the assumption that, should the Interstate Commerce Commission ultimately determine to reduce the interstate rates in question, interstate shippers would be afforded refunds accordingly; on the other hand, like refunds could not be made to Ohio intrastate shippers by reason of this Commission's purported lack of authority to order such refunds. Such a conflicting situation, Protestants argue, would give rise to rate discriminations detrimental to the interests of Ohio shippers and receivers of rail freight.

The foregoing arguments advanced by the Protestants, however, do not necessarily apply directly to the factual and legal circumstances posed herein by the railroads' proposed refund provision. The Applicant railroads have voluntarily obligated themselves under their proffered intrastate tariffs to make immediate refunds on intrastate shipments of the same type and character of any refunds which may accrue by reason of orders subsequently issued by the Interstate Commerce Commission with respect to like interstate rates. Even should it be assumed that this Commission is without statutory authority to require railroads subject to its jurisdiction to make such refunds, the precedent is well established in this State that the railroads and their shippers or receivers of freight may voluntarily agree to a refund of any rate to the extent such rate is determined to be unreasonable or improper, and such refunds have been effected over a period of many years with this Commission's formal and express authorization. Review and authorization of such refunds by this Commission are intended to preclude, of course, illegal payments of rebates and other comparable discriminatory practices prohibited by Ohio law.

Prospective determinations by the ICC, which would find the recently effected interstate rates to be unreasonable in part or in whole and subject, therefore, to refund to interstate shippers, would certainly result practically and possibly legally in discrimination against Ohio shippers who have paid like increased intrastate rates but can not

realize refunds by reason of this Commission's alleged lack of jurisdiction to require the railroads to implement such refunds. However, under the regulatory procedure presently followed, it would appear that the award of such refunds on intrastate shipments could be effected readily, (1) with the consent of the shippers or receivers of freight who are to receive the refunds and, (2) with the authorization of this Commission.

This extant and long established practice of payment of voluntary refunds is fully approved by an Opinion No. 6209, Opinions of the Attorney General for 1956, the concluding paragraph of which reads at page 80 thereof, as follows:

". . . Specifically answering your question, it is my opinion that the Public Utilities Commission of Ohio has authority to authorize a railroad company to refund, or to waive collection of, as to all shippers served under substantially similar conditions, a portion of the rates set forth in the railroad's schedule of rates for transporting property when the rate specified by the schedule has been found by the Commission to be excessive and unreasonable and a new schedule of rates setting forth a lower rate for the shipment in question has theretofore been filed with this Commission." No. 6209, Opinions of the Attorney General for 1956.

Although it follows that this procedure requires voluntary action on the part of both the shippers and the rail carriers involved, the Applicant rail carriers would be committed by reason of the refund provisions incorporated in their presently proffered tariffs and it may be assumed that consent of shippers would be readily attainable. Inasmuch as discrimination between interstate and intrastate rates is prohibited by Federal law, this Commission would look with favor no doubt upon the authorization of such refunds subsequent to the filing of tariffs for lower intrastate rates by the subject railroads.

The Commission finds, therefore, that should the increased intrastate rates proposed herein be determined to be reasonable and the same are authorized herein, the alleged detriment to Ohio shippers would appear to be illusory and the interests of Ohio shippers can be protected appropriately by this Commission within the bounds of its existing statutory authority.

II. **Validity of the Applications on their Merits**—While the existing financial status of some of the Applicant railroads would appear to be a matter of common knowledge and of apparent national concern, nonetheless, the record in this proceeding evinces clearly the present need of certain of these Applicant railroads for enhanced freight revenues through the generally selective intrastate rate increases sought herein.

The Summary of the Evidence set forth above contains the specifics offered in support of the Application which need not be reiterated in detail: only in the years 1949 and 1954 did these Applicant railroads experience a lower composite rate of return than that being presently realized; projections indicate the year of 1958 to be one of further declining revenues with a concomitant drop in both composite and individual rates of return, such composite rate of return for 1958 being estimated to be 2.19%.

Working capital of the Applicant railroads has been steadily declining for some years. The record shows it has declined 29% from October 31, 1956 to October 31, 1957, and it is fair to assume that such capital has been diminished further in light of the economy trend since the latter date.

During the same period of time, the Ohio railroads have faced rising costs: wage rates have been forced upward by both cost of living increments and wage increases awarded to employees through collective bargaining agreements; and, costs of material and supplies have risen likewise except for the cost of fuel, which has actually declined.

It would appear from the record that the rate increases here sought may not fully compensate these Applicants for increased costs to be experienced in the immediate future. The railroad witnesses claimed that, if the rates here sought were to have become effective throughout 1958, net operating income of the railroads would be $231,560,000 and would produce a composite rate of return of 2.78%. This is to be compared to a rate of return of 4.25% purportedly experienced during 1957.

In point of fact, the Protestants to this proceeding do not appear to deny the pressing need or nature of the railroads' request for additional revenue. Under these Applications, the Applicant railroads, in response to a suggestion from both this Commission and the Interstate Commerce Commission, sought to place their increases upon specific commodities and have not implemented the medium of an overall horizontal increase such as applied for historically in prior freight rate proceedings.

By way of illustration, the railroads request herein a basic increase of 10c a ton on coal. Protestants for coal producers and consumers allege that this increase sought to be placed upon the transportation of this fuel product is excessive in comparison with and relation to the transportation rates on other products. They offer challenging and arresting evidence designed to show that the Applicants are, by policy of ever-increasing transportation rates on coal, seemingly pricing the railroads out of the market and encouraging substantial diversion of coal to other media of transportation. It would seem that management of certain of the Applicant railroads might well give serious consideration to this substantially supported contention. This Commission's regulatory experience substantiates, in part, this contention of the Ohio coal producers. Such contention, however, does not go directly to the reasonableness of the selective increase in coal rates sought herein.

Protestants representing coke interests allege that the increases here sought will be higher on coke than on coal and claim that this reverses a long-standing trend in the industry whereby coal and coke have been treated similarly in past rate increase cases.

On the other hand, Protestants intervening on behalf of the clay producers contend that some change should be instituted in rate mechanics by which raw clay should now be treated as a "product of a mine," which would result ultimately in a decrease in its transportation rates under existing rate classifications. Thus, we have the anomaly of some Protestants demanding status quo and adherence to long-standing practices in establishing rail rates and another Protestant in

the same proceeding urging a change from long-existing practice to a new classification.

The burden of proof of substantiating the proposed rates in these proceedings rests with the Applicant railroads. It appears to this Commission that the subject railroads have satisfied collectively that burden, especially with respect to their extant requirements to meet increased costs and expenses and to minimize the decline in working capital herein evidenced. This Commission therefore is of the opinion from the record in this proceeding that the proposed selective rail freight rates, in the range of 1 to 3%, should be, and hereby are, authorized in light of (1) known recently implemented and prospective increases in expenses, particularly wages, (2) the presently manifested enhanced cost of financing, (3) the inadequate composite rate of return currently being realized on net plant investment, and, (4) the seeming dictates of uniformity in railroad rates.

Further, the Commission is of the opinion that the selective rate increases herein sought would appear from this record to be fair and reasonable. To determine otherwise in regard to each rate would require the substitution of the Commission's judgment for that of railroad management in an area not dictated by the status of the record herein.

With respect to the Reconsignment and Diversion Application, identified as I. & S. Case 271, no shippers appeared or offered protest to the proposal, other than the Toledo Board of Trade. As to that body, whose interest apparently runs solely to the transportation of grain and grain products, the Applicant railroads and the Toledo Board of Trade have entered into a stipulation of record. This stipulation, set forth in full above, provides in essence that the railroads will delay the effective date of their proposed increases in Reconsignment and Diversion tariffs until such time as the Interstate Commerce Commission has completed its investigation. It further assures to the Toledo Board of Trade an opportunity to appear before this Commission and present testimony prior to any increase in rates in which it is interested. The stipulation entered into by the parties in this regard appears to be reasonable in the premises. In accordance with the stipulation the Applicant railroads should make whatever additional tariff filings are necessary to make the proposed intrastate increases occur simultaneously with corresponding interstate increases.

**Ultimate Findings**

From the testimony and exhibits of record, the Commission makes the following ultimate Findings:

(1) That the Public Utilities Commission has jurisdicton over the above-entitled matters under the provisions of §§4909.27 et seq, **R. C.**;

(2) That, by these proceedings, the Applicant railroads seek to institute increases on intrastate transportation to equal in amount increases presently existing for interstate transportation, and to make said Ohio intrastate increases subject to refund in the event interstate rates are lowered by subsequent determinations of the Interstate Commerce Commission;

(3) That the refund of intrastate rates is assured to Ohio Shippers

by virtue of the refund provisions voluntarily incorporated in the Applicant railroads' proffered tariffs, and would be awarded to Ohio shippers in pursuance of the long-established procedure followed regulatorily in the State and outlined heretofore;

(4) That the evidence shows a real and pressing need for additional revenues on the part of the Applicant railroads which the rate increases here sought would produce in part;

(5) That the Protestants, except as to legal issues, object principally to the application of rates upon specific commodities for which they require transportation;

(6) That there has been no showing of an abuse of managerial discretion or an arbitrary application of rate increases with regard to the commodities under protest;

(7) That the increased rates sought are reasonable and should be authorized;

(8) That the Applicants should continue under suspension the Diversion and Reconsignment portions of their tariff in accordance with their stipulation of record; and

(9) That, subject to the conditions herein outlined, the within Application should be granted.

ORDER

It is, therefore,

ORDERED, that the Applicant railroads within the State of Ohio be, and hereby are, permitted to increase freight rates and charges to the extent authorized in this order and to make such increased rates and charges effective upon not less than three days' notice to the Commission and to the General Public, by filing and posting in the manner prescribed by this Commission in Tariff Circular No. 2 and the Revised Code of Ohio. It is further

ORDERED, that the Applicant carriers involved be, and hereby are, authorized to depart from the Commission's tariff publishing rules when providing for the increased rates and charges in the following manner:

By the publication and filing of a master tariff of increased rates and charges, and connecting link supplements to one or more tariffs connecting such tariff or tariffs or supplements to existing tariff or tariffs with the master tariff of increased rates and charges. All tariffs and supplements issued in the short form method herein authorized shall bear notation reading substantially as follows:

"The form of this publication is permitted by authority of The Public Utilities Commission of Ohio, under authority of Case No. 27,470."

It is further

ORDERED, that outstanding unexpired orders in other proceedings are hereby modified so as to permit establishment of the increases in freight rates and charges herein authorized. It is further

ORDERED, that all tariff schedules changing rates or charges under the authority of this order, which rates or charges are now maintained or held in force by virtue of outstanding orders of the Commission, shall make specific reference to this order. It is further

ORDERED, that relief from the long-and-short-haul provisions of

348

§4909.20 R. C., be, and hereby is, granted, and carriers are authorized to establish and maintain the increased rates and charges permitted by this Order without observing the provisions of said section. It is further

ORDERED, that a restriction be, and hereby is, continued in effect limiting the rates and charges for the transportation of sand, all kinds, gravel, crushed stone and crushed slag in closed-top cars to be not more than 115% of the rates for the same commodities transported in open-top cars.

All rates and charges herein authorized are subject to complaint, investigation and correction if in conflict with any provision of the law, or in contravention of any outstanding order of the Commissn.

THE PUBLIC UTILITIES COMMISSION OF OHIO

Entered in the Journal:  Everett H. Krueger, Jr., Chairman
April 26, 1958           Ralph A. Winter
A true copy:             Edward J. Kenealy
W. E. Herron, Secretary          Commissioners